IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF KANSAS

REBA HAMBY,                          )
                                     )
                  Plaintiff,         )
                                     )
        v.                           )          Case No. 08-1166-WEB
                                     )
USD 263,                             )
                                     )
                  Defendant.         )
_____ )

MEMORANDUM AND ORDER

Before the court is the defendant's Motion for Summary Judgment (Doc. 28).  The

plaintiff's complaint alleges violations of the Fair Labor Standards Act, violations of the Equal

Pay Act, and intentional infliction of emotional distress.  The plaintiff seeks compensation for

past and future pecuniary losses, compensation for past and future nonpecuniary losses,

including emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of

life, punitive damages, and costs and expenses.

I.  Facts

For the purposes of the defendant's motion for summary judgment, the following facts

are uncontroverted, deemed admitted, or, where disputed, viewed in the light most favorable to

the plaintiff.

1. Plaintiff filed her Complaint on May 30, 2008, making allegations for damages

pursuant to the FLSA, EPA and IIED. (Pretrial Order, Doc. 23, p. 2; Stipulation 1 and 2.)

2. Defendant is a public school located in Mulvane, Kansas and is supported by taxpayer

funds. (Pretrial Order Stipulations, p. 2.)

3. Plaintiff was hired as the Food Services Supervisor on August 11, 1997 and held that position until June 15, 2006. (Pretrial Order Stipulations, Doc. 23, pp. 3 and 4.)

4. Plaintiff's yearly contract ran for a period of 10-1/2 months (46 weeks). (Plaintiff's Depo, p. 109-110, Def. Def. Exhibit A)

5. The Food Services Director job description lists the position as an executive exempt employee. (Food Services Director Job Description, Def. Def. Exhibit B)

6. During plaintiff's last contract running from August 1, 2005 to June 15, 2006, her salary was $26,044. (Pretrial Order, Doc. 23, p. 4, Stipulation 15.)

7. While plaintiff was employed by USD 263, she supervised more than two employees including head cooks, cooks and warehouse staff. (Pretrial Order, Doc. 23, p. 4, Stipulation 18.)

8. Plaintiff supervised five kitchens, including all head cooks and cooks, and the warehouse. (Flow Chart, Def. Def. Exhibit C; Plaintiff's Depo., p. 70-76, Def. Def. Exhibit A)

9. Plaintiff was responsible for the hiring of the cooks that worked at the schools and had the authority to terminate. (Plaintiff's Depo, pp. 71, 102, Def. Def. Exhibit A)

10. In regard to the hiring of a head cook, plaintiff testified as follows:

> Q: If a head cook left while you were employed, did you have input in the hiring of the next head cook?
> A: Yes, I did. When Dr. Wells was there, I hired them pretty much.
> Q: When Dr. Wells was there, you completely hired them and then later it turned out you had input.
> A: Yes. Well, we tried to move people up through the ranks.

(Plaintiff's Depo, p. 70, Def. Def. Exhibit A)

11. When plaintiff arrived on the job, she did "a lot of retraining of the head cooks" in regard to "safety and sanitation." (Plaintiff's Depo, p. 69, Def. Exhibit A)

12. Plaintiff testified that she instructed them on the proper methods and procedure for

them to follow and she had the authority to provide instruction on the cooks' job performance. (Plaintiff's Depo, p. 69, Def. Exhibit A)

13. Plaintiff evaluated all of the head cooks, but allowed the head cooks under her direction to evaluate the cooks who worked under the head cooks. (Plaintiff's Depo, p. 69, Def. Exhibit A)

14. While plaintiff was in charge, she mandated the use of hair restraints and protective gloves. While some cooks "really fought it," plaintiff had the authority to enforce her changes. (Plaintiff's Depo, p. 67 - 69, Def. Exhibit A)

15. Plaintiff also testified that she implemented the Hazardous Analysis of Critical Control Points (HACCP) for the cooks and required certification for the cooks. (Plaintiff's Depo, p. 67-67, Def. Exhibit A)

16. A regular part of plaintiff's job function was to discipline the head cooks. This included a range from a write-up to telling the cook he or she was fired. Each cook and the head cooks were subject to plaintiff's discipline or correction. (Plaintiff's Depo, p. 72, Def. Exhibit A)

17. Plaintiff required that the kitchen staff had to maintain their own production records and the head cooks were responsible for those. The production records and sales records were then brought to plaintiff and she would prepare a report that went to Topeka for federal reimbursement purposes. (Plaintiff's Depo, p. 72-73, Def. Exhibit A)

18. Plaintiff testified that the reporting process and record compliance was a lot of work and was very time consuming. (Plaintiff's Depo, p. 73, Def. Exhibit A)

19. Plaintiff was also responsible for determining which food was ordered and used in the

five kitchens. (Plaintiff's Depo, p. 74, Def. Exhibit A)

20. Plaintiff was also responsible for receiving, organizing and cataloging the food. (Plaintiff's Depo, p. 74-75, Def. Exhibit A)

21. Plaintiff testified that accounting was part of her job and she did a lot of record keeping about the choice of meals. (Plaintiff's Depo, p. 76-77, Def. Exhibit A)

22. Plaintiff was also responsible for talking to the food sales vendors and making decisions about ordering the food. (Plaintiff's Depo, p. 77, Def. Exhibit A)

23. Plaintiff testified that after she had been there awhile, she changed the type of food that was purchased, and she had authority to do so. (Plaintiff's Depo, p. 87, Def. Exhibit A)

24. Plaintiff mandated that all five kitchens use the same recipe. The practice when plaintiff arrived was for all of them to use their own recipe. (Plaintiff's Depo, p. 70, Def. Exhibit A)

25. Plaintiff evaluated the efficiency and productivity of the head cooks and their staff. (Plaintiff's Depo, p. 82,  Def. Exhibit A)

26. Plaintiff was responsible for keeping all the food in the warehouse that was ordered safe and maintaining it at the right temperature. Plaintiff reorganized the warehouse because it was a "mess" when she arrived. (Plaintiff's Depo, pp. 83, 214, Def. Exhibit A)

27. Plaintiff had an office near the warehouse and supervised a separate warehouse employee. At one time, she had two warehouse employees that were under her direct supervision. Plaintiff also trained the warehouse employees. (Plaintiff's Depo, pp. 67, 80, 84, Def. Exhibit A)

28. Plaintiff made the decision to reduce the hours of the cooks and the head cooks in

order to meet budget. (Plaintiff's Depo, p. 87-88, Def. Exhibit A)

29. Plaintiff was in charge of determining what food the various kitchens received based upon the menu she designed. She also supervised the delivery of the food to the schools. (Plaintiff's Depo, p. 78-79, Def. Exhibit A)

30. Plaintiff was responsible for scheduling the deliveries at the particular schools and when they received their food. (Plaintiff's Depo, p. 82, ll. 2-8, Def. Exhibit A)

31. Plaintiff was responsible for review and approval of all the time sheets submitted by the head cooks and the cooks. (Plaintiff's Depo, p. 89, Def. Exhibit A)

32. Plaintiff did not have to turn in a time sheet to anyone and was not required to keep one. (Plaintiff's Depo, p. 89, Def. Exhibit A)

33. In regard to acting as a substitute food server or cook in the schools, plaintiff testified:

> Q: Did you ever fill in as a –
> A: Yes.
> Q: -- as a server in any of these schools?
> A: I did. When someone didn't show up, if they needed me I would go to the school and work.
> Q: So you were kind of a spot fill-in.
> A: Yes.
> Q: But that wasn't part of one of your regular duties.
> A: No, I didn't do it that much but I did it.

(Plaintiff's Depo, p. 77-78, Def. Exhibit A)

34. Plaintiff was always a salaried employee while she worked at the school district. (Plaintiff's Depo, p. 126,  Def. Exhibit A)

35. The average wage of cooks and head cooks supervised by plaintiff under her last contract was $8.76 per hour. (Affidavit of Tom Keil, ¶14, Def. Exhibit D.)

36. The wage of the warehouse employees during plaintiff's last contract was $7.70 per hour. (Keil Affidavit, ¶15, Def. Exhibit D.)

37. According to plaintiff's job description as Food Services Director, the qualifications were:

> 1. Health and inoculation certificate on file in the central office (after employment offer is made); maintain current TB testing as required by health department regulations.
> 2. Successful completion of the state food service courses, including baking, main dish and management.
> 3. Ability to maintain a neat, clean appearance.
> 4. Ability to lift 30 pounds.
> 5. Desire to continue career improving by enhancing skills and job performance.

(Food Services Director Job Description, Def. Exhibit B; Keil Affidavit, ¶2, Def. Exhibit D.)

38. Plaintiff's salary was not based on her gender. It was based on the job she performed and the skills required. (Affidavit of Donna Augustine-Shaw, Superintendent, ¶¶3 & 4, Def. Exhibit E.)

39. Plaintiff's predecessor had been paid $17,000. (Plaintiff's Depo, p. 53, Def. Exhibit A)

40. Plaintiff has identified her only comparators as the Director of Building and Grounds and the Director of Transportation. (Pretrial Order Stipulations, Doc. 23, p. 2.)

41. The job description for the Building and Grounds Director lists the qualifications as follows:

> 1. Such alternative qualifications as the USD No. 263 Board of Education may find appropriate and acceptable.
> 2. Any health, literacy, citizenship, or other such requirements.
> 3. Any specific skill mastery requirement.
> 4. Possess valid Kansas driver's license.
> 5. Ability to work cooperatively and constructively with others.

6. Ability to manage job responsibilities while meeting the established district outcomes.

(Building and Grounds Director Job Description, Def. Exhibit F; Keil Affidavit,

¶2, Def. Exhibit D)

42. At the time plaintiff was employed by the Mulvane School District, the Building and

Grounds Director was Mike Fells. (Keil Affidavit, ¶3, Def. Exhibit D.)

43. Mr. Fells is a certified welder; holds a heating and cooling certification; is a certified

first responder and firefighter; is OSHA certified in lockout, tagout safety measures; and is

certified in Total Quality Management. (Keil Affidavit, ¶4, Def. Exhibit D.)

44. Mr. Fells also has experience in the operation of heavy equipment, is OSHA certified

in forklift operation and has a background in hydraulics. (Keil Affidavit, ¶5, Def. Exhibit D.)

45. The Building and Grounds Director is responsible for maintaining 13 acres of roofs

on schools within the Mulvane School District including five educational buildings, one district

office, the Mulvane Recreational Center and all athletic fields. (Keil Affidavit, ¶6, Def. Exhibit

D.)

46. The Building and Grounds Director is responsible for 140 acres of grounds including

ensuring all grounds are properly maintained by mowing in the spring, summer and fall, and

snow removal completed in the winter. (Keil Affidavit, ¶7, Def. Exhibit D.)

47. The Building and Grounds Director is responsible for all the heating and cooling

systems and electrical systems at all of the above-referenced buildings. (Keil Affidavit, ¶8, Def.

Exhibit D.)

48. The Director of Building and Grounds is responsible for maintenance of the football

and baseball fields and keeping all mowers, tractors and other equipment used to maintain these

fields in operating order. (Keil Affidavit, ¶9, Def. Exhibit D.)

49. The Director of Building and Grounds supervises a painting crew throughout the summer to paint all buildings and supervises the maintenance crew that does maintenance that can only be completed during the summer months under his direct supervision. During the summer, he also supervises the mowing crew. (Keil Affidavit, ¶10, Def. Exhibit D.)

50. The Director of Building and Grounds is responsible for all electrical and lighting needs throughout the district including the lighting at the district's football and baseball stadiums. (Keil Affidavit, ¶11, Def. Exhibit D.)

51. The Director of Building and Grounds is responsible for monitoring building expenses at all buildings and keeping a sufficient supply of items necessary for repairs needed at the buildings. (Keil Affidavit, ¶12, Def. Exhibit D.)

52. The Director of Building and Grounds also coordinates the remodeling and major maintenance projects and schedules the projects in order to have the least disruption as possible of student learning time. (Keil Affidavit, ¶13, Def. Exhibit D.)

53. The Building and Grounds Director is a 12 month position and the Building and Grounds Director's salary in 2005-2006 was $48,170 for a 12 month contract, instead of 10-1/2 month contract like plaintiff had. (Keil Affidavit, ¶2, Def. Exhibit D.)

54. The Director of Building and Grounds is required to be able to regularly lift 60 pounds while the Food Services Director is required to lift 30 pounds. (Director of Building and Grounds Job Description, Def. Exhibit F; Director of Food Services Job Description, Def. Exhibit B)

55. The Director of Building and Grounds is on call 24 hours a day to respond to

maintenance emergencies. (Keil Affidavit, ¶26, Def. Exhibit D.)

56. The Director of Transportation Job Description qualifications are as follows:

> 1. Such alternative qualifications as the USD No. 263 Board of
> Education may find appropriate and acceptable.
> 2. Any health, literacy, citizenship or other such requirements.
> 3. Any specific skill mastery requirement.
> 4. Possess a valid CDL license with required endorsements.
> 5. Meet all state requirements for bus drivers, including
> defensive driving and first aid certification.
> 6. Be able to pass initial and random tests for alcohol and
> controlled substances.
> 7. Complete required physical examination for bus drivers.
> 8. Ability to work cooperatively and constructively with others.
> 9. Ability to manage job responsibilities while meeting the
> established district outcomes.

(Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit,

Def. Exhibit D.)

57. The Director of Transportation's salary in 2005-2006 was $42,974 for a 12 month

contract. (Keil Affidavit, ¶2, Def. Exhibit D.)

58. At the time of plaintiff's last contract, the Director of Transportation was Robert

Young. (Keil Affidavit, ¶16, Def. Exhibit D.)

59. Mr. Young, in addition to his regular duties as Director of Transportation, taught a

defensive driving course and was the First Aid trainer. (Keil Affidavit, ¶17, Def. Exhibit D.)

60. The Director of Transportation must have an extensive background and

understanding of logistics and fleet management. (Director of Transportation Job Description,

Def. Exhibit G; Keil Affidavit, ¶18, Def. Exhibit D.)

61. At the time plaintiff was employed, the Director of Transportation was responsible

for nine regular bus routes, operating twice a day; four shuttle bus routes, operating twice a day;

and all after school transportation activities, including field trips, sporting events and extracurricular activities. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶19, Def. Exhibit D.)

62. During plaintiff's employment, the Director of Transportation was required to keep up with all of the Department of Transportation laws regarding school buses and hold a commercial driver's license. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶20, Def. Exhibit D.)

63. During plaintiff's employment, the Director of Transportation was responsible for the district's conformance with state insurance regulations for the operation of school buses. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶21, Def. Exhibit D.)

64. The Director of Transportation is also required to hold a commercial driver's license. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶22, Def. Exhibit D.)

65. During plaintiff's last contract, the Director of Transportation was also charged with developing a program for preventative safety to reduce student injury on school buses. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶23, Def. Exhibit D.)

66. The Director of Transportation must have background knowledge of Special Education programs in order to provide the necessary special education transportation that is required by Section 504 of the ADA and IDEA (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶24, Def. Exhibit D.)

67. During the time plaintiff was employed, the Director of Transportation formulated

and negotiated the contractual agreements on the commodities market for the purchase of diesel fuel. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶25, Def. Exhibit D.)

68. At the time of plaintiff's employment, the Director of Transportation was responsible for maintaining all district buses and shuttle buses and planning and completing preventative maintenance. (Director of Transportation Job Description, Def. Exhibit G; Keil Affidavit, ¶26, Def. Exhibit D.)

69. The Director of Transportation is on call 24 hours a day to respond to transportation emergencies. (Keil Affidavit, ¶27, Def. Exhibit D.)

70. The Director of Building and the Grounds and Director of Transportation are required to work indoors and outdoors all year round. (Director of Transportation Job Description, Def. Exhibits G; Director of Building and Grounds Job Description, Def. Exhibit F)

71. The Director of Transportation's physical requirements include driving skills and the ability to operate a vehicle at night. (Director of Transportation Job Description, Def. Exhibit G.)

72. The Director of Transportation is required to develop plans for preventative maintenance, take an active role in solving discipline problems: annually review the advisability of district-owned transportation system and develop recommendations for future transportation needs. (Director of Transportation Job Description, Def. Exhibit G.)

73. The Director of Building and Grounds' Job Description includes maintaining all district-owned equipment and development of plans for preventative maintenance; specifications to be incorporated in all contractual agreements; approves alterations to contractual agreements when requested by contractors; as well as have the skills and mastery required for the position.

(Director of Building and Grounds Job Description, Def. Exhibit F.)

74. Plaintiff testified that the Director of Building and Grounds would repair refrigerators, stoves, ovens, plumbing and heating. (Plaintiff's Depo, p. 137, Def. Exhibit A)

75. Plaintiff also testified that the Director of Building and Grounds supplied his own tools. (Plaintiff's Depo, p. 137, Def. Exhibit A)

76. Plaintiff testified that the Director of Building and Grounds did some electrical work and he also did refrigeration repair on the refrigerators. (Plaintiff's Depo, p. 138, Def. Exhibit A)

77. Plaintiff testified that her job was not the same as the Director of Building and Grounds and the Director of Transportation. (Plaintiff's Depo, p. 145, Def. Exhibit A)

78. Plaintiff admits there was a different working environment for her job than the two comparators. (Plaintiff's Depo, p. 145,  Def. Exhibit A)

79. Plaintiff testified that if someone wanted to determine what the Director of Building and Grounds and Director of Transportation did in the 2005-2006 school year, it would be necessary to ask those individuals. (Plaintiff's Depo, p. 147, Def. Exhibit A)

80. The Director of Human Resources testified that the jobs of the Director of Building and Grounds and Director of Transportation required more experience, training and education than the plaintiff's position and this required the district to pay the Directors of Building and Grounds and Transportation a higher wage. (Keil Affidavit, ¶28, Def. Exhibit D.)

81. In support of her IIED claim, plaintiff testified that her employer was outrageous in "the tone and the way that they treated me. They condescended (sic) to me." (Plaintiff's Depo, p. 158,  Def. Exhibit A)

82. Plaintiff also testified that her employer "didn't care" and "they were callous."

(Plaintiff's Depo, p. 158-591, Def. Exhibit A)

83. Plaintiff testified that it was extreme and outrageous the way that she was compensated and it was humiliating that her salary was listed in the paper.[1] (Plaintiff's Depo, p. 159, Def. Exhibit A)

84. Plaintiff thought the way she was terminated was extreme and outrageous because they terminated her in a letter and not in person. (Plaintiff's Depo, p. 159, Def. Exhibit A)

85. Plaintiff also testified that it was extreme and outrageous that her supervisor and one of his staff started attending meetings that she scheduled with her cooks. (Plaintiff's Depo, p. 160-61, Def. Exhibit A)

86. Plaintiff also testified that during these meetings, it was extreme and outrageous because of the unprofessional tone that her supervisor used directed towards her in these meetings. (Plaintiff's Depo, p. 160-161, Def. Exhibit A)

87. Plaintiff testified that one time she went to her supervisor's office and "he told us he wasn't going to take any crap[2] off of us." (Plaintiff's Depo, p. 161, Def. Exhibit A)

88. Plaintiff also testified that her supervisor was talking to her in a stern voice and he said, "you need to get Lynn Bowen and that ala carte straightened out there or we're going to be looking for a new head cook and a new director right in front of people . . . ." (Plaintiff's Depo, p. 162, Def. Exhibit A)

89. Plaintiff testified that she never suffered a physical injury because of the extreme or

---

[1]The salaries of the administrators of a public school are subject to open records laws and upon request, must be produced.

[2]At one point in plaintiff's deposition, she alleged he said he would not "take any s***."

outrageous conduct of her employer. (Plaintiff's Depo, p. 164, Def. Exhibit A)

90.  Tom Keil is currently the Director of Human Resources and an employee of U.S.D. 263.  In his role, he maintains all personal files and job descriptions.  (Keil Affidavit, D. Exhibit D).

II.  Jurisdiction

Subject matter jurisdiction is properly invoked under 28 U.S.C. § 1331.  The defendant disputes the court's jurisdiction over the intentional infliction of emotional distress claim.  As discussed below, the plaintiff has not complied with the requirement set forth in Kansas state statutes, and the court does not have jurisdiction over the IIED claim.

III.  Standard of Review

Summary judgment is appropriate when "the pleading, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  Wright v. Abbott Labs., Inc., 259 F.3d 1226, 1231-32 (10th Cir. 2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  Faustin v. City & County of Denver, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party.  Id.

The moving party bears the burden of showing the absence of any genuine issue of material fact. Celotex Corp. V. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may satisfy its burden by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

IV. Discussion

a. Fair Labor Standards Act

The defendant argues the plaintiff is an exempt employee under the FLSA, and therefore is not covered by the FLSA. The plaintiff concedes that she is an exempt employee.

The FLSA provides an exemption for any employee employed in a "bona fide executive, administrative, or professional capacity" as defined by the Secretary of Labor. 29 U.S.C. § 213(a)(1). An employee is executive, administrative, or professional if the employer demonstrates that the employee (1) is compensated on a salary basis at a rate of not less than $455.00 per week, (2) whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof; (3) who customarily and regularly directs the work of two or more other employees; and (4) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight. 29 C.F.R. § 541.100. Since the plaintiff concedes she is an exempt

employee, and she meets the definition of exempt employee, the defendant's motion for summary judgment is granted on the plaintiff's FLSA claim.

b.  EPA

The plaintiff alleges the defendant intentionally discriminated against plaintiff on the basis of her sex by paying her lower wages then it paid its male directors.  The plaintiff argues that she was performing work that was equal to the work of the Director of Transportation and the Director of Building and Grounds.

The plaintiff must establish: (1) she was performing work which was substantially equal to that of the male employees considering the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; and (3) the male employees were paid more under such circumstances.  Sprague v. Thorn Americas, Inc., 129 F.3d 1355, 1364 (10th Cir. 1997), citing Tidwell v. Fort Howard Corp., 989 F.2d 406, 409 (10th Cir. 1993).  If the plaintiff makes the prima facie showing, the defendant must demonstrate that there were valid reasons for the pay difference, such as a seniority system, a merit based system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex.  Id.  (quoting 29 U.S.C. § 206(d)(1)).  If the defendant does not show a valid reason for the pay differential, the plaintiff's claim for a violation of the EPA will survive summary judgment.

The defendant must "submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons could explain the wage disparity, but that the proffered reasons do in fact explain the wage disparity."  Mickelson v. New York Life Ins. Co.,

460 F.2d 1304, 1312 (10th Cir. 2006) citing Stanziale v. Jargowsky, 200 F.3d 101, 107-08 (3rd Cir. 2000). For the employer to prevail at the summary judgment stage, "they must produce sufficient evidence such that no rational jury could conclude but the proffered reasons actually motivated the wage disparity of which the plaintiff complains." Stanziale at 108. In the analysis, the court must be mindful that the equal work requirement of the EPA is not to be construed broadly. Nulf v. Int'l Paper Co., 656 F.2d 553, 560 (10th Cir. 1981). "Like" or "comparable" work does not satisfy the standard, and there must be more than similarities between some aspects of the two jobs. Id.

The plaintiff has identified two positions in the school district which she asserts are substantially equal, are held by men, and are paid at a higher rate. The plaintiff was employed as the Director of Food Services for U.S.C. 263. The comparators are the Director of Building and Grounds and the Director of Transportation.

The plaintiff has the burden of proving that her job and the job of the comparators involve substantially equal work. Corning Glass Works v. Brennan, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The "equal work" requirement of the EPA is not construed broadly, and failure to furnish equal pay for "comparable work" or "like jobs" is not actionable. Nuff, 656 F.2d at 560. The jobs must be equal in terms of skill, effort, responsibility, and working conditions. 29 U.S.C. § 206(d)(1). The jobs that are being compared need to be substantially equal, not identical. E.E.O.C. v. Central Kansas Medical Center, 705 F.2d 1270, 1272 (10th Cir. 1983) overturned on other grounds McLaughlin v. Richland Shoe Co., 486 U.S. 128, 108 S.Ct. 1677, 100 L..Ed.2d 115 (1988). "Skill includes such considerations as experience, training, education, and ability. Effort refers to the physical or mental exertion necessary to performance

of a job.  Responsibility concerns the degree of accountability required in performing a job."  Id.

(Quoting E.E.O.C. v. Universal Underwriters Insurance Co., 653 F.2d 1243, 1245 (8th Cir.

1981).

The plaintiff argues the comparators' jobs do not require additional training or

experience.  The plaintiff argues that although the Director of Building and Grounds was

certified in refrigeration and heating and air, certified in heavy equipment operator, a certified

fork lift operator, and a certified welder, these skills are not part of the Director of Building and

Grounds job description, therefore not part of the qualifications for the job.

A review of the job description for the Building and Grounds Director contains the

following qualifications:

1.  Such alternative qualifications as the USD # 263 Board of Education may find
appropriate and acceptable.
2.  Any health, literacy, citizenship, or other such requirements.
3.  Any specific skill mastery requirement.
4.  Possess valid Kansas driver's license.
5.  Ability to work cooperatively and constructively with others.
6.  Ability to manage job responsibilities while meeting the established district
outcomes.

The job description also contained "essential functions", which included the "ability to operate

all equipment and machinery appropriately as necessary" and "maintain safety standards in

conformance with the district guidelines."  The Director of Buildings and Grounds must also

prepare and administer the building and grounds budget; maintain all district-owned equipment

and develop plans for preventive maintenance; complete and dispatch information for insurance

reports; provide the purchasing department with contractor performance qualification data;

develop recommendations for future building, equipment and personnel need;, formulate the

specification to be incorporated in contractual agreements; and approve alterations to contractual

18

agreements when requested by contractors and school principals.

The job description for the Director of Transportation contains the following

qualifications:

1. Such alternative qualifications as the USD # 263 Board of Education may find appropriate and acceptable.
2. Any health, literacy, citizenship, or other such requirements.
3. Any specific skill mastery requirement.
4. Possess valid CDL license with required endorsements.
5. Meet all state requirements for bus drivers, including defensive driving and first aid certification.
6. Be able to pass initial and random tests for alcohol and controlled substances.
7. Complete required physical examination for bus drivers.
8. Ability to work cooperatively and constructively with others.
9. Ability to manage job responsibilities while meeting the established district outcomes.

The job description also contains the following requirements: conform with all state laws and

regulations regarding school transportation; maintain safety standards in conformance with state

insurance regulations and develop a program of preventive safety; advise superintendent on road

hazards for decision on school closing during inclement weather; act as a liaison with contractor

for consultation on road hazards for decision on school closing during inclement weather;

develop and administer a transportation program to meet all the requirements of the daily

instructional program and extracurricular activities; formulates the specifications to be

incorporated in contractual agreements; approve alterations to contractual agreements when

requested by contractors and school principals; prepares bus routes for all schools in district;

authorize purchases in accordance with budgetary limitations and district rules; maintain all

district-owned equipment and develop plans for preventative maintenance; complete information

for insurance reports; take an active role in solving discipline problems on the school bus; act as

a liaison with parents for complaints and special requests; provide the purchasing department

with contractor performance qualification data; review the advisability of a district owned

transportation system; develop recommendations for future equipment and personnel needs

based on a survey of resident students, distances, and grade levels; and develop

recommendations for future transportation needs based on an annual survey of resident students.

The job description of the plaintiff's job contained the following qualifications:

1. Health and Inoculation Certificate on file in the central office. Maintain
current TB testing as required by Health Department regulations.
2. Successful completion of the State food service courses, including baking,
main dish, and management.
3. Ability to maintain a neat, clean appearance.
4. Ability to lift 30 pounds.
5. Desire to continue career improvement by enhancing skills and job
performance.

Additional responsibilities contained in the plaintiff's job description include the ability to

supervise and coordinate food services to ensure proper nutrition and safeguard the health of

students, staff, and visitors; responsible for the daily operation of the kitchen, including the

ordering of supplies; involved in the daily distribution of meals, and assisting where needed;

ability to practice procedures in food preparation; use and care of equipment and personal habits

to be sure sanitation standards are met; ability to follow standards of safety in storing and serving

food; ability to maintain a required system of accountability by managing the program in

accordance with federal, state, and local requirements; keep accurate record of all lunches, paid,

free, reduced, and adult; responsible for accurate daily deposits; ability to keep daily menu

planning book; responsible for turning in all reports, including inventory; ability to implement

and follow all district health and safety policies, including all precautions of the Bloodborne

Pathogens Exposure Control Plan.

The courts have been directed to look at the experience, education, training, and ability to

determine if the jobs of the plaintiff and the comparators are of equal skill. The court has not been presented with information to find the comparators perform substantially equal work as the plaintiff. A review of the functions of the three employees shows substantially different requirements. The Director of Building and Grounds was required to operate all the equipment and machinery. As set forth in the affidavit of Tom Keil, he was therefore certified in forklift operation and had an understanding of hydraulics. The Director of Building and Grounds was also required to maintain all district owned equipment. Therefore, he was a certified welder, and held a heating and cooling certificate. Because he was required to maintain the buildings in compliance with OSHA regulation, he was also OSHA certified in lockout and tagout safety measures, and was certified in Total Quality Management. The Building and Grounds Director was also responsible for making recommendations for future building and equipment, he had to approve alterations to contractual agreements, and dispatch insurance reports, which required him to advised and consult with the administration of U.S.D. 263.

The Director of Transportation also has the responsibility of advising and consulting with the administration on school closings and the district owned bus fleet. He also has to develop programs for transportation for the school district. He is required to remain current in the law on contract, school transportation, and insurance. He must maintain his CDL license, and he must ensure the school is in compliance with insurance requirements. The Director of Transportation is responsible for negotiation contracts for fuel for the district. The Director of Transportation was also required to have interaction with students regarding discipline problems, and interaction with parents.

The plaintiff's position required her to follow health and safety policies, and follow

standards of safety in storing and serving food, as well as the daily operation of the kitchens. However, the Director of Food Services did not have the responsibilities of the comparators positions, in terms of advising the administration, input on contracts, or the required certification to perform their jobs. The plaintiff's position required knowing the standards and policies in the food service industries, and being able to follow them, however, the plaintiff was not required to develop programs which would be implemented in the schools, nor did her position require her to advise the administration on contracts or other areas in her department. She was not involved in decision making and advising, unlike her comparators. She was also not required to have direct interaction with the students or the parents. The court also notes she was not on call 24 hours a day, as her comparators were. Finally, the comparators jobs are year round positions, where as the plaintiff's position is a ten and a half month contract.

The plaintiff has the burden of proving that her job and the job of the comparators involve substantially equal work. <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). The plaintiff has not presented additional information or corroborating evidence of the job content of the comparators. In fact, in her deposition, when she was questioned about the comparators' jobs, the plaintiff did not have a clear idea of the comparators job on a daily basis.

> Q: Did they work in the same office as you did?
> A: No.
> Q: So you didn't observe their day-to-day duties.
> A: Well, I worked in the same building with the building and grounds director, but the transportation director was at a different location.
> Q: And where was the transportation director located at?
> A: It was actually down close to the - you know where the old bus barn is there in Mulvane? It was there. Had a little bitty office.
> .......
> Q: How often did you communicate with the director of building and grounds?

A: Well, I saw him daily. You know, I saw him constantly and he did a lot of stuff with my department.

Q: Such as?

A: He would repair equipment that would break down and just come and talk with me about different things. Mainly equipment.

Q: What type of things did he come and repair?

A: Refrigerators, stoves, ovens, plumbing, heating. Things of that nature.

Q: And that was specifically Mr. Fells at the time you left?

A: Yes. And he had - actually he had two employees, too. There were two people that worked under his supervision.

Q: Mr. Fells was equipped to fix stoves and the ovens and do plumbing and those types of things?

A: He had - I think he brought his own tools.

Q: Did he do any electrical work?

A: He did some. He did a little bit. I think he had one of his employees that had some electrical background.

Q: And did he also do some refrigeration repair on refrigerators?

A: Yes.

...

Q: Do you have any knowledge of what skills Mr. Fells was required to have to do his job other than when he would come into the kitchen and fix things under your supervision?

A: I have some general knowledge.

Q: Tell me what your general knowledge is of what type of skills Mr. Fells needed outside of fixing things in your kitchen that we've already discussed.

A: I think that he had to have some all-around knowledge of how to do most things, and if anything got very difficult he would have to call in someone who really knew how to do it.

....

Q: Do you have knowledge of what skills were required by Mr. Young (Director of Transportation) to do his job?

A: Somewhat.

Q: Give me the extent of your knowledge of the skills that Mr. Young was required to do his job.

A: I worked in the same building with a bus driver who worked for Mr. Young. She was a part-time - a substitute bus driver and she was the custodian there at the Bloomingshine Building, and he would come by there and talk with her in my presence, and so I know a lot about - I know a lot of the things that he had to do, yes.

...

Q: And what kind of knowledge would you get from being in the bus barn about what Mr. Young did?

A: Just pretty much personal observations. He had one mechanic who worked for him. They didn't do any mechanic work on the vehicles. They took them out. I

think they had to wash the busses, he had to schedule the bus drivers, so I did have some - I mean the knowledge to know this: He had to schedule the bus drivers and route off of the bus trips, and that took a certain amount of expertise to do that. Had to have some geographical knowldge and scheduling so I did know that. Dealing with people, had to have that knowledge.

The Tenth Circuit has stated "when significant amounts of time are spent on different tasks, equal work is not involved." Nuff v. International Paper Co., 656 F.2d 553, 561 (10th Cir. 1981) (quoting Brennan v. South Davis Community Hospitals, 538 F.2d 859, 862-63 (10th Cir. 1976). Employers are not required to furnish equal pay for "comparable work" or "like jobs". Id. at 560. It is clear that plaintiff's position and her job duties were not "substantially equal" to those of her comparators. The plaintiff testifed in her deposition as follows:

Q: Now you understand you're not claiming that the job of building and grounds director or supervisor was the same as the director of food service, are you?
A: It was different.
Q: It was a different job. And the same for director of transportation, it was a different job as well.
A: Different job.
Q: And required different skills and abilitites; correct?
A: (Witness shakes head.)
Q: And in fact different working environment; correct?
A: Yes.
Q: And that went for both jobs. There were different working environments for the building and grounds; correct?
A: Yes.
Q And different working environments for the director of transportation; correct?
A: Yes.
Q: And in fact, there were lots of different things that you did that they didn't do; correct?
A: A lot.
Q: And vice versa. They did a lot of things that you didn't do; correct?
A: I'm sure.

The plaintiff has not presented evidence to show that her job duties are comparable or substantially equal to those of her comparators. The job descriptions do not list tasks that are similar, nor was the plaintiff was able to specifically state similar core job duties of the

comparators.  The plaintiff cannot rely on the job titles of "Director" to assert that she had a comparable job to the comparators.   Job titles or descriptions are not determinative without cooberating evidence of actual job content.  <u>Mulhall v. Advance Sec. Inc.</u>, 19 F.3d 586, 593 (11th Cir.), cert denied, 513 U.S. 919, 115 S.Ct. 298, 130 L.Ed.2d 212 (1994).  The plaintiff has not come forth with sufficient, reliable evidence from which a reasonable jury could find that her job as the Director of Food Services and the job of Director of Transportation and the Director of Building  and maintenance share common job duties.  The plaintiff has not set forth a prima facia case under EPA.  The defendant's motion for summary judgment on the EPA claim is granted.

c.  Intentional Infliction of Emotional Distress

The defendant requests dismissal of the plaintiff's intentional infliction of emotional distress claim as the plaintiff did not file a notice of claim as required by K.S.A. § 12-105b.  The plaintiff concedes a 12-105b notice letter was not sent to the defendant.

K.S.A. 12-105b provides a procedure which must be followed prior to filing claims against a municipality.  "Any person having a claim against a municipality which could give rise to an action brought under the Kansas tort claims act shall file a written notice as provided in this section before commencing such action."  K.S.A. 12-105b(d).  A school district is a municipality under the KTCA.  K.S.A. § 75-6102(b).  The notice requirement is mandatory and a condition precedent to bringing a tort claim against a municipality.  <u>Tucking v. Bd. of Comm'rs</u>, 14 Kan.App.2d 442, 445, 796 P.2d 1055 (1990).   Notice is required for claims against the municipality and for claims against individuals employed by the municipality who act in the scope of their employment.  <u>King v. Pimentel</u>, 20 Kan.App.2d 579, 589, 890 P.2d 1217 (1995).  Failure to comply deprives the court of subject matter jurisdiction over tort claims raised against

a municipality.  <u>Scheideman v. Shawnee County Bd. Of County Com'rs</u>, 895 F.Supp. 279, 282

(D.Kan. 1995).

In <u>Miller v. Brungardt</u>, Judge Van Bebber ruled that the notice requirement set forth in

K.S.A. 12-105b did not attach to the plaintiff's intentional infliction of emotional distress claim

against the school's vice-principal because the vice-principal's actions were outside the scope of

his employment.  916 F.Supp. 1096, 1101 (D.Kan. 1996).  In <u>Miller</u>, the plaintiff alleged facts of

sexual harassment and intentional infliction of emotional distress.  However, in <u>Phillips v.</u>

<u>Humble</u>, the court found that a claim of intentional infliction of emotional distress and sexual

battery against a police officer for an overly intrusive search was not outside the scope of the

defendant's employment, and the notice requirement of 12-105b attached.  587 F.3d 1267 (10th

Cir. 2009).

The plaintiff does not allege that any person acted outside the scope of their employment.

The plaintiff has not named an individual in the lawsuit, only the school district.  In her

deposition, the plaintiff states that her supervisor attended meeting that she scheduled with her

cooks, and on one occasion he stated "he wasn't going to take any crap off us."  The plaintiff

does not allege her supervisor was acting outside the scope of his employment when he attended

the meetings or visited with her in  his office.  The plaintiff did not comply with the notice

requirement set forth in state statute, and therefore this court is without jurisdiction to decide the

claim.  The defendant's motion for summary judgment is granted on the plaintiff's intentional

infliction of emotional distress claim.

V.  <u>Conclusion</u>

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment (Doc.

28)  be GRANTED  in accordance with the above rulings.

IT IS ORDERED that the plaintiff Reba Hamby recover nothing, the action be dismissed on the merits, and the defendant USD 263 recover its costs of action from the plaintiff.

SO ORDERED this 28th day of February, 2010.

_s/ Wesley E. Brown_____
Wesley E. Brown, U.S. Senior District Judge